## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JESSICA REYHER,<br><br>                Defendant. | Crim. Action No. 1:23CR138 |

### <u>MEMORANDUM IN AID OF SENTENCING</u>



*Ms. Reyher and her four children*

Jessica Reyher is a mild-mannered, devoted mother of four who traveled with her husband to Washington, D.C., from her home in Indiana because the President and other prominent elected officials had urged Americans to come protest an election that Mr. Trump and his allies repeatedly characterized as fraudulent.

Concerned about these widespread reports of election irregularities, Ms. Reyher came expecting to attend a peaceful protest. After hearing some of the speeches at the Ellipse, she and her husband, Arthur Reyher, followed the swell of the crowd to the Capitol grounds. While Ms. Reyher was part of a crowd on the Lower West Terrace, the video evidence shows that *she never came into direct contact with any law enforcement officer. She did not taunt, harass, assault, or harm any officer.* Instead, the video evidence shows that she stood behind Arthur, following him, often ducking behind him, as he maneuvered around the chaotic crowd. When FBI agents came to

arrest Ms. Reyher, she was entirely respectful. She has expressed her remorse and shame for her involvement in the crowd that day through her plea and in private conversations with close friends and loved ones.

The defense has reviewed the pre-sentence report (PSR) and submits the following responses: First, Ms. Reyher qualifies for a two-level "zero point offender" adjustment under USSG § 4C1.1. She has no criminal record, and her offense did not involve violence or credible threats of violence. Therefore, her adjusted offense level is 9, yielding a guideline range of 4 to 10 months. Second, a downward variance is appropriate because application of a three-level enhancement under USSG § 2A2.4(b)(1) for "physical contact" overstates Ms. Reyher's culpability because she did not have direct physical contact with nor did she injure any officer. While the parties stipulated that § 2A2.4(b)(1) applies pursuant to the plea agreement, the "physical contact" enhancement encompasses a wide range of conduct. Here, where Ms. Reyher did not have any *direct* contact with an officer and where she did not injure an officer, three additional levels, which amount to a guideline increase of six months of imprisonment, is more draconian than her conduct warrants.

Regardless of the guideline range this Court calculates, Ms. Reyher, through counsel, submits that a sentence of probation with conditions is sufficient but no greater than necessary to meet the goals of sentencing.

## I.   Procedural history

Ms. Reyher was arrested at her home outside Indianapolis, IA, on March 15, 2023. The government did not oppose release and she has been compliant with her

conditions of her release since her initial appearance. Ms. Reyher pleaded guilty to one count of civil disorder, in violation of 18 U.S.C. § 231, pursuant to a plea agreement on November 16, 2023, after which she cooperated with the Pre-Sentence Investigation.

## II.      Application of the sentencing factors

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added). Honest application of the federal sentencing statute confirms that a sentence of probation to include community service is sufficient, but not greater than necessary, to meet the goals of sentencing. What follows is a detailed review of the relevant §3553(a) factors.

### i.      Jessica Reyher's history and characteristics support a probationary sentence.

### a.  Jessica's childhood was marred by ███████████ and her parents' alcohol abuse.

Jessica Reyher was born in Zionsville, Indiana, and has lived there her entire life. She is 39 years old. Her mother separated from her biological father when Jessica was a baby. When Jessica was 30 years old, she established a relationship with her biological father, though she did not know him growing up. Years after her parents' separation, her mother's husband, Russell Wilson, adopted Jessica. When Jessica was a child, her mother worked in the sales department of a steel company and her stepfather worked in sanitary construction. Her mother and her stepfather drank heavily after work. When they drank, they became violent. Jessica recalls her parents

would scream and throw objects at each other after a night of heavy drinking. During these frequent episodes of violence, she hid in her room, anxiously waiting for her parents to pass out or leave before daring to exit her bedroom. While her mother and stepfather did not physically abuse her when they were drinking, they were emotionally abusive. Jessica recalls they would threaten divorce and demand that the children tell them which parent they would choose to live with. When Jessica had her own children, she vowed she would never put them through the trauma she endured because of her parents' drinking.



. Jessica never received the counseling she needed to fully heal from her childhood traumas.

b. **Notwithstanding childhood trauma, Jessica maintained a positive outlook and graduated from high school**.

Perhaps to contrast her chaotic home life, Jessica was a serious, disciplined high school student. When her peers started drinking and experimenting with pills, she steered clear of "partying." She studied hard and was a cheerleader and teacher cadet. As a teacher cadet, she taught students with special needs that attended her high school. Jessica graduated from high school at the top of her class. After high

school, she worked and went to school. During the day, she worked at a local home for mentally challenged adults. At night, she took classes to earn her medical assistant's certificate.

When she was 19, Jessica met Arthur Reyher. Arthur's grandparents lived across the street from Jessica's family. The two would run into one another when Arthur visited his grandparents. Soon, they were dating. To Jessica, Arthur was a strong, stable partner—someone who could give her something different than the chaos of her childhood. Two years after they met, they married. Their first child was born in 2005, one year after they married. A second and third baby soon followed. Jessica continued to work at the home until the couple's third child was born. After their third child, it became too difficult for her to leave for work because childcare cost more than she earned. Consequently, in 2007, Jessica quit her job to become a full-time homemaker. In 2011, she had her fourth child. While Jessica has not worked outside the home since 2007, she has assisted Arthur with his businesses. Arthur currently has a small construction business.

### c. Ms. Reyher is an involved and loving mother to her children and daughter to her mother.

Today, the Reyhers' children are 19, 16, 13, and 12 years old. Jessica's children are her pride and joy. It is evident to anyone who visits the home that Jessica throws herself into raising her children. One family friend writes that Jessica "is a wonderful mother, who homeschools her children, spends quality time with them, showing them

family values and love. They need her in their life."[1] Jessica wants to give her children the happy, stable home life she did not have due to her parents' alcoholism and the sexual assaults she endured. Jessica has homeschooled the children since the pandemic and ensures that they are each involved in enriching extracurricular activities. For example, the couple's 12-year-old daughter plays soccer.  Their 13-year-old opted for gymnastics. The youngest loves to bake. Jessica finds joy in cultivating each of her children's unique interests and talents.



*The Reyher family*

At the same time, Jessica cares for her mother, who long ago stopped drinking when she was diagnosed with serious medical issues. Recently, Jessica's mother was hospitalized for several days because she was having trouble breathing. The family recently learned that she will have to be on oxygen in order to remain home. Jessica takes her mother to her various appointments, feeds her mother, helps to bathe her, and ensures that she takes all her medications. Jessica is central the health and stability of her family.

### ii. The nature and circumstances of Ms. Reyher's offense merit a probationary sentence.

The Reyhers traveled to Washington, D.C., to attend the Stop the Steal rally, intending to peacefully protest. Jessica had not voted for Donald Trump (she voted

---

[1] Letter of Bethany Clark, attached as part of Exhibit 1.

third-party) but she and her husband had believed the lies the President and other political leaders had been spreading that the 2020 election was unfair due to fraud. Of course, the Reyhers were not alone in believing that the 2020 election had been unfair. Indeed, one year after the election, almost a third of Americans still believed that President Biden won the election due to voter fraud.[2] The current Speaker of the House is one of the Americans who evidently still believes this lie.[3] When powerful leaders, including the president himself, and so-called news outlets are spreading the fiction, Jessica, a high school graduate and mother of four, can hardly be blamed for believing the lies. She came intending to peacefully stand up for a principle that matters to her, ensuring the fundamental right to free and fair elections. She now sees the terrible irony in that. But before January 6, 2021, she was earnest in her beliefs and she never intended to be part of anything violent or unlawful.

The Reyhers came to Washington, D.C. one day early, on January 5, to take in the sights, as Jessica had never been to D.C. before. After a day of sightseeing, they went to the Ellipse to catch some of the rally. When they left the Airbnb for the Ellipse, they had no inkling of the chaos that would that would ensue. After hearing the some of the speeches, they followed the swell of the crowd towards the capitol on to the grounds. When they got on the grounds, Arthur wanted to move in deeper. He

---

[2] NBC News, June 20, 2023, *Almost a third of Americans still believe the 2020 election result was fraudulent.* https://www.nbcnews.com/meet-the-press/meetthepressblog/almost-third-americans-still-believe-2020-election-result-was-fraudule-rcna90145

[3] AP News, October 23, 2023, *New US House Speaker tried to help overturn the 2020 election*, https://apnews.com/article/congress-house-speaker-2024-election-certification-8cd7c5a9e6ae69635bbb4624cc78e5c5

thought they could help control the crowd while also joining the protest. At one point, as described in Arthur's Position on Sentencing, he did come to Officer Fanone's defense. ECF. No. 138 at 12. Looking back on the day, Jessica realizes that Arthur's belief that they should stay in the crowd was misguided. But in the stress of being amidst the largest crowd she had ever been a part of, Jessica did not want to be separated from Arthur. She followed Arthur, often ducking behind him. She did not enter the "tunnel" in order to participate in any violence. While she was part of a crowd that was pushing in the tunnel, she did not directly push any officer. She did not coordinate any assault. She did not throw anything at an officer or threaten an officer.  At some point, she heard shouts that someone was "stuck," and she yelled to let him go. But for one brief moment when she was next to Arthur, Jessica positioned herself behind Arthur, who held his hands up:

**Screen shots showing Jessica positioned behind Arthur**:









After remaining on the West Terrace for approximately 45 minutes, the Reyhers left.

When she returned home, Jessica did not boast about or in any way glorify what

happened. Before or after January 6, she did not post any incendiary comments about

the day. Instead, she expressed her remorse and regret to close friends and family.

To this point, Jessica's sister-in-law writes,

> I have talked to Jessica several times, she expresses her deepest regret.
> She wishes she would have told Adam[4] to leave when things got out of
> hand. She stayed by Adam's side in the large crowd for protection and
> did not want to get separated from him. They were never there to act on
> violence and wishes she could take this day back.

---

[4] Arthur often goes by Adam, his middle name.

9

Letter of Fred and Carrisa Brent.[5] When agents came to speak to Jessica and, later, to arrest her, Jessica was respectful and compliant.

### a. Ms. Reyher qualifies for the "zero-point offender" adjustment.

Ms. Reyher has no criminal history. Her offense did not involve violence on her part or a credible threat of violence. Therefore, she is a perfect candidate for the recently promulgated "zero-point offender" reduction under USSG § 4C1.1. The Commission promulgated the zero-point offender provision in recognition of low recidivism rates of first-time offenders and the Congressional directive "that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense."[6] Through exclusions set forth in 4C.1, the Commission has identified crimes that are violent or otherwise serious and not likely to fall under the directive of § 994 (j). *See* 4C1.1(a)(2)-(10) (excluding from application of zero-point offender provision all offenses that involve terrorism, violence or threats of violence, death or serious bodily injury, sex offenses, substantial financial hardship to victims, dangerous weapons, violations of individual rights, hate crimes, vulnerable victims, violations of human rights, aggravated role adjustments, or engaging in a continuing criminal enterprise). Ms. Reyher's conduct does not fall within one of the enumerated exclusions. Ms. Reyher's status as a zero-point offender also supports a variance to a sentence that does not include a term of

---

[5] Letters in support of Ms. Reyher attached as Exhibit 1.
[6] Amendments to Sentencing Guidelines (April 27, 2023) at 78-80 (citing 28 U.S.C. § 994 (j)).

incarceration because she is a first-time offender convicted of a non-violent offense that is not "otherwise serious." *See* 28 U.S.C. § 994 (j); U.S.S.G. § 5C1.1.

The government has taken the position that, categorically, no January 6 defendant qualifies for the adjustment. The government's categorical position that no January 6 defendant, including Ms. Reyher, is precluded from the adjustment flies in the face of the text of the guideline and the fundamental sentencing principle that sentencing should be individualized to the defendant and the defendant's conduct.[7] Indeed, while January 6 as a whole was a serious and terrible day, it cannot be said that Ms. Reyher's *individual offense* (being in the middle of a large crowd that was obstructing police) is "otherwise serious" under this definition. Similarly, while violence certainly occurred on January 6, Ms. Reyher's *individual conduct* was not violent and did not involve credible threats of violence.

The Sentencing Guidelines Manual itself does not define the term "use violence or credible threats of violence" within §4C1.1 or its commentary. And when no definitions are provided for, courts can look to dictionary definitions to determine meaning. *See Kaufman v. Nielsen,* 896 F.3d 475, 485-87 (D.C. Cir. 2018). Recently the Hon. Trevor McFadden issued an opinion discussing dictionary definitions of violence when considering the application of §4C1.1, and he found that that violence is: "'[t]he

---

[7] The government's position that no January 6 defendant is worthy of the adjustment promotes an impression that January 6 defendants are being treated unfairly vis a vis other defendants. *See* Colleen Long and Michael Kunzelman, *Judge questions whether Jan. 6 rioters are treated unfairly*, AP, October 21, (2021) (reporting that a district judge suggested that the Justice Department was being too hard on those who broke into the Capitol compared to people arrested during anti-racism protests following George Floyd's murder).

use of physical force, typically 'accompanied by fury, vehemence, or outrage,' and 'unlawfully exercised with the intent to harm'" or the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, 1:21-386-2-TNM, Mem. Op., ECF No. 195, at 4-5 (internal citations omitted).

Other courts interpreting the term "violence" where it appears in other parts of the Sentencing Guidelines have found that to qualify as "using violence," one must "use[] physical force with the intent to injure[.]" *United States v. Pineda-Duarte*, 933 F.3d 519, 523 (6th Cir. 2019) (interpreting U.S.S.G. § 2D1.1(b)(2)'s identically-worded "used violence" provision in the absence of a Guidelines definition and relying on Black's Law Dictionary and Webster's Dictionary). And "credible threats of violence" require one to credibly "express an intention to inflict pain, harm, or punishment" through violence. *See United States v. Hernandez-Barajas*, 71 F.4th 1104, 1107 (8th Cir. 2023) (cleaned up) (interpreting U.S.S.G. § 2D1.1(b)(2) and quoting definition of "threats" from *American Heritage Dictionary of the English Language* 1813 (5th ed. 2016)).

The evidence nowhere near establishes that Ms. Reyher used violence or credible threats of violence on January 6. She did not punch, kick, hit, or throw any objects at law enforcement officers, nor did she intend to injure anyone. While she was part of the group pushing against the police line, her conduct does not rise to the level of violence or credible threats of violence. The level of her force was not intended to cause injury. *See, e.g. United States v. Jaimes-Molina*, No. 17-cr-69, 2019 WL 4254459, at *5 (N.D. Ind. Sept. 9, 2019) ("The Court cannot say that the shove [of the

officer], while a use of physical force, was the use of violence as intended for the §2D1.1(b)(2) enhancement.").

### b. District Judges have approved the zero-point adjustment in similar January 6 cases.

District judges confronted with similar facts have applied the zero-point offender adjustment over the government's objection. The Hon. John D. Bates recently applied the adjustment and issued an opinion rejecting the government's "violence-by-presence" in the mob theory in two cases similar to Ms. Reyher's but where the defendants arguably were *more* forceful towards police officers than Ms. Reyher was. *U.S. v. Yang*, No. CR 23-100 (JDB), 2024 WL 519962 (D.D.C. Feb. 9, 2024) (granting 4C1.1 adjustment where defendant grabbed an officer's wrist during a scuffle and was part of a crowd that did not depart in the face of advancing police line). The Hon. Amit P. Mehta similarly rejected the government's argument that, because January 6 was a violent day, an individual defendant who was part of a crowd that engaged in violence but who did not himself engage in violence is ineligible for the reduction. *United States v. Parks*, No. 21-cr-411. In *Parks*, the government argued that because the defendant was at the "front of a crowd rush" and was "aware of [violence]," the adjustment did not apply.[8] Judge Mehta applied the adjustment, finding that, though the defendant did "participate in the larger crowd," his offense "did not result in death or serious bodily injury" and the defendant "did not use violence of credible threats of violence."[9] Similarly, in *United States v. Weyer*, 22CR40

---

[8] *U.S v. Parks*, Sentencing Tr. at 38.
[9] *Id.*

(JEB), the court found that the adjustment would apply for a defendant who, with a mob, "marched up the steps and forcibly pushed and shoved their way toward the Rotunda Door."[10] The defendant, separately, pushed past police officers and commanded others to "charge" and "break that door." Nonetheless, the Hon. Chief Judge Boasberg found the zero-point offender adjustment (which had not yet been promulgated) would apply.[11] These cases show that an unbiased application of the facts to the criteria set forth in USSG § 4C1.1 makes clear that Ms. Reyher qualifies for the zero-point offender adjustment.

### c. A three-level increase for "physical contact" overstates Ms. Reyher's culpability.

Pursuant to the plea agreement, Ms. Reyher has stipulated that a three-level increase for "physical contact" under USSG § 2A2.4 (b)(1)(A) technically applies because she was part of a crowd that pushed towards officers. However, counsel submits that a downward variance is appropriate on these facts because a three-level enhancement overstates Ms. Reyher's culpability.

"Physical contact" under 2A2.4 (b)(1)(A) can encompass a wide range of conduct. While no federal court has defined "physical contact" for purposes of 2A2.4 (b)(1)(A), the Seventh Circuit has explained that the meaning can "be derived by examining the law of battery." Battery is defined as "intentional and wrongful physical contact with a person." *United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (enhancement properly applied where inmate threw a cup of urine in a

---

[10] *United States v. Weyer*, 22CR40 (JEB), ECF. No., 58, Gov. Sentencing Memo at 2.
[11] *United States v. Weyer*, Sentencing Tr. at 20.

prison guard's face) (internal citations omitted). The enhancement has been applied in contexts in which the defendant's contact with a victim was more aggravated than Ms. Reyher's presence in the large crowd. For example, the Ninth Circuit upheld the application of the enhancement where the defendant kicked the victim correctional officer, causing him to lose his balance and hit his head. *United States v. Hill*, 996 F.2d 1228 (9th Cir. 1993); s*ee also United States v. Martinez-Alvarez*, 422 Fed. Appx. 356 (5th Cir. 2011) (affirming application of physical contact and bodily injury enhancements where defendant was convicted of assault on an officer and the assault caused painful swelling and bruising to the officer's knee and arms.). Here, where Ms. Reyher did not have any direct contact with any officer, did not intentionally assault an officer, and did not injure an officer, the Court should vary downward because a three-level increase to the offense level overstates the nature of her conduct.

Should the Court apply the zero-point offender adjustment and a one-level variance because Ms. Reyher's physical contact was not direct or injurious, the total offense level would be 8, yielding guideline range of 0 to 6 months.

### iii.   A probationary sentence will avoid unwarranted disparity with other cases involving more culpable conduct and other civil disorder cases.

### a. Ms. Reyher's conduct is not more culpable than the conduct of defendants convicted of misdemeanors and sentenced to probation.

Ms. Reyher's conduct that day is not markedly more culpable than that of defendants convicted of misdemeanor offenses and sentenced to probation. To the contrary, her passive conduct is *less* culpable than that of many defendants convicted of misdemeanors and sentenced to probation.  For example, in *United States v. Lollis*,

15

1:21CR671(BAH), the defendant entered the Capitol with a large group of rioters through the Senate Wing door, where two adjacent windows had been broken and rioters were climbing through; asked a police officer whether he was on the "same team" and then taunted the officer when he did not respond; and later joined rioters on the Lower West Terrace entrance, where the Reyhers were located. Mr. Lollis pleaded guilty to parading and picketing, in violation of 40 U.S.C. §5104(e)(2)(G), and was sentenced to probation with a condition of home detention.[12] In *United States v. Wilson,* 1:21CR578 (APM), the defendant entered the Capitol through a broken window, posted pictures of himself inside the building to Facebook, entered Speaker Nancy Pelosi's office and took a video inside, remained inside the Speaker's office for five minutes, traversed almost the entire length of the Capitol, and lied to FBI agents after about his participation in the riot.[13] Defendant Wilson was convicted of parading and picketing, in violation of 40 U.S.C. §5104(e)(2)(G), and sentenced to 24 months' probation, notwithstanding the government's request for 14 days incarceration. In yet another misdemeanor case, *United States v. Brian Sizer*, 22CR376 (JEB), the defendant observed numerous rioters climbing the scaffolding and walls and attempting to break windows. He took over 90 photos on his phone of restricted areas of the Capitol. He entered through the smashed Parliamentarian Door. At one point, instead of leaving the Capitol building, he turned the opposite direction of the exit and entered a Senate office. He took a picture of himself sitting in an office chair with

---

[12] 1:21CR671, Government's Sentencing Memo, ECF. No. 24.
[13] 1:21CR578. Government's Sentencing Memo, ECF. No. 49.

his feet up. Finally, he was not truthful about his conduct when interviewed by law enforcement.[14] Though he breached a Senate office, the district judge imposed a probationary sentence.

As the above cases demonstrate, it is difficult to pinpoint what made Ms. Reyher's conduct worse than defendants convicted of misdemeanors. Surely, the government will point to her presence near and in the area now infamously known as the "tunnel." But she should not be subjected to a more significant sentence than those who intentionally, *directly* obstructed police simply because she remained in a certain location. Notably, she did not leave because she did not want to become separated from her husband.

**b. A probationary sentence would not create a sentencing disparity with other January 6 civil disorder cases.**

The above cases and other misdemeanor cases demonstrate a sentence that would allow Ms. Reyher to remain with her children would not create a disparity with other civil disorder cases involving equally culpable, if not worse, conduct than Ms. Reyher's. The cases below show that probation would not create an unwarranted disparity even when considered among other Section 231 cases.

*United States v. Timothy Hart*, 21CR540 (PLF)

Defendant Hart was convicted of civil disorder for joining rioters to overrun barriers manned by police in the first breach of the Capitol grounds. He then ignored the pepper spray around him and made his way into the building, where he remained

---

[14] 1:21CR376, Government's Sentencing Memo, ECF. No. 29.

for 22 minutes. While inside the Capitol, he smoked marijuana in the Rotunda.[15] The district judge imposed a sentence of 36 months' probation notwithstanding the government's request for four months incarceration.

*United States v. Brian Preller*, 23CR45 (TNM)

Defendant Preller, a member of the "Guardians of Freedom," an organization loosely affiliated with the Three Percenters, entered the Lower West Terrace "tunnel," where he confronted police officers and added his effort to other protestors in a "heave-ho" effort against the police line. Mr. Preller wore large googles, a helmet, and a tactical vest that carried what appeared to be a chemical irritant spray in the front. Following January 6, Mr. Preller posted several statements taking credit for January 6, 2021. For example, when someone asked him what he had been doing, he responded, "continuing to build my 3% army so I can overthrow the federal government."[16] The district judge rejected the government's request for eight months incarceration and instead imposed a sentence of 60 months' probation. Though she was also in the Lower West Terrace tunnel, Ms. Reyher's conduct was less aggravated than Mr. Preller's. A sentence of probation for Ms. Reyher would avoid an unwarranted sentencing disparity with a similar (though more culpable) defendant.

*United States v. Benjamin Cole*, 23-CR-113(TNM)

Mr. Cole, a member of the Guardians of Freedom, also joined the group of protestors at the Lower West Terrace tunnel. Cole joined in a "heave ho" effort with

---

[15] 1:21CR540, Government's Sentencing Memo, ECF. No. 69.
[16] 1:23CR45, ECF. 90, Government's Sentencing Memo

other protestors. Mr. Cole wore a tactical vest and carried a black expandable metal baton. Mr. Cole joined protestors in attempting to forcefully push through the police line at the tunnel entrance to the Capitol. After January 6, Mr. Cole posted messages to his Facebook calling the FBI a "joke" and claiming that he did "absolutely nothing" at the Capitol. The first time he was interviewed by the FBI, he denied coming near the Capitol. For all of this, Mr. Cole was sentenced to 14 days of intermittent confinement. By contrast, Ms. Reyher did not wear any tactical gear, she did not post messages to social media minimizing her conduct, and she was open and cooperative with law enforcement.

A period of incarceration for Ms. Reyher would create unwarranted sentencing disparity as compared to other, more aggravated cases involving convictions under Section 231.

### c. A probationary sentence, with continuing conditions, will achieve the goals of sentencing.

Unfortunately, the government appears to reflexively request draconian prison sentences for January 6 defendants without regard for the 3553(a) factors that the Court must consider and alternatives for first offenders like Ms. Reyher. The Supreme Court has recognized that continuing supervision is also a punishment. A sentence of continuing supervision is hardly a free pass. *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass"). Restitution, especially for someone with Ms. Reyher's means, is also a punishment. *United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is [...] part

19

of the criminal defendant's sentence."). Moreover, Ms. Reyher will experience long-lasting consequences for her felony conviction, which cannot be overstated. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. For example, in another January 6 case, the Honorable Amit P. Mehta observed

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[17]

Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of civil death and send the unequivocal message that "they" are no longer part of "us."

---

[17]*United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

188 F. Supp. at 3d at 179 (internal quotations, alterations, and citations omitted). In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs. Though that defendant's guideline range was 33-41 months, Judge Block "rendered a noninarceratory sentence . . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180.

The collateral consequences that Ms. Reyher has already experienced and will continue to experience are severe and should be considered by this Court in assessing what would constitute a "just punishment" and "adequate deterrence." News of her arrest and trial were publicized in her community. As a result of her and Arthur's arrests, they lost business. For a family with four children and a grandparent to care for, the loss of income has a significant impact. If Ms. Reyher ever wants to go back to work in the medical field, she will certainly encounter roadblocks to advancement due to her felony conviction. Ms. Reyher's entanglement in the criminal legal system is more than sufficient to deter her from ever crossing the line again. She has spent sleepless nights worrying about what will become of her family if she and Arthur are in prison. Even just the fear of additional consequences beyond what she has experienced is more than sufficient to deter Ms. Reyher from exercising bad judgment again. Indeed, she has no desire to attend any kind of political rally again.

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty

of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[18] In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Ms. Reyher or others from committing this offense.

Finally, locking up a humble mother of four for traveling to the Capitol with her husband at the invitation of the president—especially while the powerful organizers of the rally remain in positions of power—will do nothing to prevent political violence should Mr. Trump (or anyone else) decide to rally and enflame his supporters once more.

---

[18] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay*, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

**Conclusion**

Jessica Reyher has admitted to, and feels ashamed for, the crime that she committed. She has lost business and peace of mind over the past two years. Counsel recommends that a sentence that is sufficient and not more than necessary is one that avoids active incarceration and allows her to stay with her children and mother who need her, with the clear message that any errors on her part can result in a revocation of her supervision and loss of freedom.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER
_____/s/_____
ELIZABETH MULLIN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
