## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ARTHUR REYHER &**<br>**JESSICA REYHER,**<br><br>        **Defendants.** | **Case Nos. 23-cr-138-004, -005 (RBW)** |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Co-defendants Arthur Reyher and Jessica Reyher have each pled guilty to Count One, charging a violation of 18 U.S.C. § 231(a)(3) (Civil Disorder). For the reasons set forth herein, the government requests that this Court sentence Arthur Reyher to 12 months of incarceration, which is the middle of the guideline range—8 to 14 months—calculated by the Probation Office and agreed to by the parties, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment. The government requests that this Court sentence Jessica Reyher to 9 months of incarceration, which is the low end of the guideline range—8 to 14 months—calculated by the Probation Office and agreed to by the parties, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment. As explained in this memorandum, a longer sentence is warranted for Arthur Reyher, because his conduct was more aggravating than Jessica's conduct: he entered the tunnel first, made it father into the tunnel, directed other rioters, and encouraged rioters to "PUSH" into the police officers. Thus, although the Reyhers remained together during their involvement in the January 6 riot, Arthur Reyher's

1

conduct warrants a longer sentence.

## I.  INTRODUCTION

The defendants, Arthur Reyher and Jessica Reyher, a married couple from Indiana, vigorously participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Arthur Reyher and Jessica Reyher were knowing and enthusiastic participants in the Capitol riot on January 6, 2021. After illegally entering Capitol grounds, the Reyhers maneuvered through thousands of rioters, made their way to the Lower West Terrace, and entered the "tunnel." Some of the most violent conduct on January 6 occurred in the tunnel. That was the location where officers used their bodies to create a human barricade in a tight corridor to prevent rioters from flooding into the heart of the Capitol building. It was where rioters continuously attacked those officers in an effort to gain entry.

The Reyhers joined that attack on numerous instances. During one of their attacks in the tunnel, the Reyhers made it to nearly the front of the mob of rioters and pushed directly into the police officers – with Arthur Reyher at the front and Jessica Reyher immediately behind him.

---

[1]  As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

During another attack, the Reyhers joined the mob and used the full force of their body weight to collectively push against the officers as rioters coordinated the pushes by yelling, "Heave! Ho!" The rioters crushed an officer between a door frame and a stolen police shield held by a rioter. Even after officers finally cleared the tunnel after the Reyhers' third time in the tunnel, the Reyhers remained at the mouth of the tunnel and continued to fight the officer line, joining other rioters in forcefully pushing into the police officers. In addition to leading Jessica Reyher into the tunnel several times, Arthur Reyher also encouraged other rioters, yelling commands like, "PUSH!!"

For that violent and violence-abetting conduct, the government recommends that the Court sentence Arthur Reyher to 12 months of incarceration and Jessica Reyher to 9 months of incarceration. These recommendations reflect the gravity of the Reyhers' criminal conduct while also taking into account their admissions of guilt.

## I.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statements of Offense filed in this case, ECF Nos. 86, 87 ¶¶ 1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      The Reyhers' Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, the Reyhers traveled from their residence in Brownsburg, Indiana to Washington, D.C. for the "Stop the Steal" rally. In the early afternoon of January 6, after watching the former president's speech, the Reyhers marched to the U.S. Capitol. They entered the restricted Capitol grounds on the West Front when it was a scene of chaos. Tear gas and other chemical

irritants filled the air, emergency warning systems blared into the crowd, bike racks littered the ground, and the line of police officers spread across the West Front were under constant attack from the mob.

### 1. The Attempted Breach Of The Capitol Building And Assaultive Conduct In The Tunnel Leading To The Doors Of The West Front Of The U.S. Capitol Building

On the West Front, after having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front; officers were ultimately overwhelmed, the police line collapsed, and rioters flooded onto the Lower West Terrace ("LWT"). As officers struggled to find a safe location to establish a new police line, a general retreat was called. With their defensive lines extinguished, police officers were surrounded by the crowd and rioters seized control of the Lower West Terrace and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.

Officers escaped into the nearest entrance to the Capitol building – the tunnel, a narrow hallway with an archway under construction in preparation for the inauguration.

4



*Images 1-2: Screenshots from body worn camera footage showing the entrance to the tunnel (left photo) and the interior of the tunnel (right photo) on January 6, 2021*

The tunnel leads into the center of the Capitol building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. *See* "Inauguration at the U.S. Capitol," Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

After the officers retreated inside the tunnel, rioters followed. When rioters arrived at the double glass doors at the rear of the tunnel, police officers closed and locked the outer set of doors to secure the Capitol building. Members of Congress who had fled from the rioters were sheltering nearby. At about 2:42 p.m., the mob broke through those outer double glass doors. The rioters pushed their way into the second set of doors and physically engaged police officers. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

5

January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat police officers. The battle for the LWT entrance involved intense hand-to-hand combat and some of the most violent acts against police, including the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them. The rioters mounted a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Capitol Police Sergeant Aquilino Gonell, who was present in the tunnel that day, explained:

What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were

committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. It is not an exaggeration to state the actions of these officers in thwarting the mob at the tunnel entrance potentially saved the lives of others, including members of Congress.

**2.      The Reyhers' Actions In The LWT Tunnel**

      **A.      The Reyhers' Initial Entry Into the Tunnel**

For their part, after making it through the crowds on the West Front, the Reyhers ascended to the LWT and made their way to the tunnel. They first entered the tunnel at 2:43 p.m., within

one minute of rioters smashing through the glass doors. As they made their way into the tunnel, the Reyhers joined other rioters yelling chants such as "USA! USA! USA!" and "WHOSE HOUSE? OUR HOUSE!"



*Images 3-4: Screenshots from Capitol surveillance footage showing the Reyhers (red box) enter the tunnel at 2:43:15 p.m. as they yelled with the crowd*

As they continued to yell, the Reyhers quickly pushed their way to the front of the pack of rioters in the tunnel.



*Image 5: Screenshot of Capitol surveillance footage showing the Reyhers moving to the front of the mob*

By 2:46 p.m., the Reyhers made it to the front of the mob where they remained for six minutes. During this time, police officers and rioters battled. Police officers continuously yelled, "BACK UP!" and "MOVE BACK!" but the rioters – the Reyhers included – refused to obey the orders. Rioters continuously thrust their bodies into the police line, yelling "OUR HOUSE!"

Officers deployed chemical irritants to disperse the crowd. Many of the rioters quickly cleared out of the tunnel; the Reyhers did not. Arthur Reyher made it face-to-face with the police line and thrust his body directly into police officers, with Jessica Reyher right behind him. As the Reyhers continued to push at the front of the line, one officer separated from the police line and became trapped between a door frame and the pack of rioters. The Reyhers – just inches away – contributed to the perilous position of the officer as he struggled to defend himself.

 

*Images 6-7: Screenshots from third-party video footage showing the Reyhers (red box) at the front of the mob – directly in front of the police line – as rioters thrust into the officers; one officer was trapped between the door and the mob (yellow box, left photo)*

While police officers bore the brunt of the collective assaults from the mob, numerous rioters passed forward stolen police shields and used them as weapons against the officers while

other rioters sprayed chemical irritants at the police officers.



*Image 8: Screenshot of Capitol surveillance footage showing officers barricaded in the tunnel fighting with rioters as rioters used weapons against the officers, including spraying chemical irritants at the officers, visible in orange on the officers' shields*

The Reyhers remained at the front of the mob during this chaos, with Arthur Reyher immediately in front of the police officers, yelling and pushing his body with other rioters in an attempt to break through the police line and gain entry into the building.



*Image 9: Screenshot of body worn camera footage showing Arthur Reyher at the front of the police line yelling at and pushing into the police line*

At 2:49 p.m., as the Reyhers and others continued the attack, one rioter – Daniel Rodriguez – began spraying a fire extinguisher at the police officers. With no escape in the close confines of the tunnel, the police officers were forced to inhale the substance and became covered in white

10

powder, unable to see ahead. Even so, the officers continued fighting to protect the building as rioters continued to push.



*Images 10-12: Screenshots of third-party video footage showing the Reyhers (red box, left photo) at the front of the mob pushing into the officer line as another rioter emptied a fire extinguisher in the officers' faces (middle and right photos)*





*Images 13-14: Screenshots of Capitol surveillance footage showing officers getting sprayed with a fire extinguisher (top photo) and immediately after (bottom photo) while fighting the rioters, including the Reyhers*

Around 2:50 p.m., while the Reyhers remained at the front of the mob, the mob of rioters began coordinated pushes against the officers. One rioter coordinated the mob by using his fingers to count off "1, 2, 3" and yelling "PUSH!" Another method adopted by the rioters included rhythmically yelling, "Heave! Ho!" and locking arms or bodies with each other as the rioters – the Reyhers included – moved backwards in unison before rocking and pushing forward together. That meant the officers in the tunnel had to sustain the weight of all the rioters moving forward against them at once.

In an effort to regain momentum, Metropolitan Police Sergeant William Bogner yelled to his officers, "Are you ready? PUSH!" and the police officers initiated a counter-push. By 2:51 p.m., the officers gained ground in the tunnel. The mob of rioters were pushed back toward the mouth of the tunnel and only then, at about 2:52 p.m., did the Reyhers drop away from the police line.





*Image 15-16: Screenshot of Capitol surveillance footage showing the Reyhers (red box) falling back from the police line (top photo) and watching the violence continue against the officers (bottom photo)*

After watching the continued fighting, the Reyhers exited from the tunnel. Once outside the tunnel, Arthur Reyher raised his hands and yelled to other rioters, "Don't hit 'em! KEEP YOUR HANDS UP AND PUSH!"



*Images 17-18: Screenshots of third-party footage showing the Reyhers exiting the tunnel (left photo) and Arthur Reyher directing rioters to "KEEP YOUR HANDS UP AND PUSH!"(right photo)*

## B.    The Reyhers' Second Entry Into The Tunnel

At about 2:58 p.m., the Reyhers reapproached the tunnel. As the Reyhers moved back towards the epicenter of violence, Arthur Reyher joined the crowd chanting "USA! USA! USA!" and encouraged other rioters who were exiting the tunnel with injuries.

13



*Images 19-20: Screenshots of third-party footage showing Arthur Reyher (red box) joining "USA!" chants (left photo) and patting an injured rioter on the head as he retreats from the tunnel (right photo)*

By about 3:00 p.m., the Reyhers approached the mouth of the tunnel for the second time.

For several minutes, Arthur Reyher watched as rioters passed stolen police shields into the tunnel

and continued to attack the police line. Arthur Reyher joined the chant, "OUR HOUSE!"



*Image 21: Screenshot of Capitol surveillance footage showing the Reyhers talking to each other at the mouth of the tunnel (red box, top photo), and Arthur Reyher (red box, bottom left photo) peering into the tunnel and chanting (bottom right photo)*

At about 3:04 p.m., the Reyhers re-entered the tunnel. Likely experiencing the effects of

chemical irritant lingering in the tunnel, the Reyhers covered their faces as they moved forward.

14

The Reyhers once again joined the assault and used their body weight to physically push in unison with the rioters into the officers.



*Images 22-23: Screenshot of Capitol surveillance footage showing the Reyhers (red box) entering the tunnel for the second time*

Still covering their faces, the Reyhers exited from the tunnel for the second time. They remained near the mouth of the tunnel as rioters flowed in and out of the tunnel and as rioters yelled, "We need fresh people!!"

By about 3:08 p.m., while still near the mouth of the tunnel, Arthur Reyher yelled "PUSH!" and patted rioters on the back as they entered the tunnel.



*Images 24: Screenshot of third-party footage showing the Reyhers (red boxes) as Arthur Reyher encouraged other rioters*

### C.       The Reyhers' Third Entry Into The Tunnel

Shortly thereafter, another individual came out of the tunnel and yelled several times, "We are almost through!" Arthur Reyher exclaimed "PUSH!" and "OUR HOUSE!" At that point, another rioter turned to the Reyhers and said, "hey guys, are you going in or not?" Arthur Reyher peered into the tunnel and then, at about 3:12 p.m., he and Jessica Reyher rushed into the tunnel for a third time.



*Image 25: Screenshot of third-party footage showing Arthur Reyher (red box) peering into the tunnel before entering the tunnel for the third time*

Almost immediately upon entering the tunnel, the Reyhers joined the collective efforts to push against the police line.



16

 

*Images 26-28: Screenshots of third-party video footage from inside the tunnel showing the Reyhers using the weight of their bodies to join the collective pushes as they bashed into the police line (top photo, bottom left photo); Arthur Reyher turning and yelling to other rioters (bottom right photo)*

As the crowd thrust their collective body weight into the officers, Metropolitan Police Department Officer Daniel Hodges became stuck between a metal door frame and a riot shield held by a rioter. In what was one of the most visceral and prolonged attacks against a police officer on January 6, the officer's chest became compressed and his body trapped as the collective weight of the mob – the Reyhers included – collectively slammed into the officer line. As that officer was crushed by the mob, another rioter (Steven Cappuccio[2]) took advantage of the officer's vulnerability and forcefully ripped off the officer's gas mask and struck the officer directly in the face with a stolen police baton.[3]

---

[2] Cappuccio was found guilty of Assault with a Deadly or Dangerous Weapon for this attack following a trial before Judge McFadden. *See* 21-cr-40 (TNM). Cappuccio was sentenced to 85 months of incarceration.

[3] *See Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Hodges) available at https://www.cspan.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.



*Image 29: Screenshot of third-party footage showing a police officer crushed between a metal door frame and a stolen police shield held by a rioter, as the weight of the rioters' collective thrusts injured the officer*

### D.   The Reyhers Continue Their Participation In The Assaults From Outside The Mouth Of The Tunnel

After their third stint in the tunnel, the Reyhers exited from the tunnel but remained near the mouth of the tunnel. Then, at about 3:17:15 p.m., they again joined rioters in the tunnel. The mob thrust back and forth several feet as they collectively pushed against the police line. The Reyhers joined the forceful push several times.



*Images 30: Screenshots from Capitol surveillance footage showing the Reyhers (red box) joining the mob and pushing against the police line*

At about 3:18:15 p.m., police officers successfully gained ground in the tunnel and pushed forward, causing the rioters – the Reyhers included – to fall back. As officers pushed forward, another rioter – Alburquerque Head – wrapped his arm around Officer Michael Fanone's neck and dragged Officer Fanone off the police line and into the crowd.



*Image 31: Screenshot of Capitol Surveillance footage showing a rioter with his arm around Officer Fanone's neck, dragging Officer Fanone into the crowd (red circle)*

The rioters brutally assaulted Officer Fanone. Rioters hit Officer Fanone with a flagpole and rioter Daniel Rodriguez reached his arm towards the side of Officer Fanone's neck with an electroshock weapon in hand, landed the device on the side of Officer Fanone's neck, and tased him. Officer Fanone screamed in pain, jerked his head back recoiling from the shock, and pulled his face away. Rodriguez struck again, placing the electroshock weapon on the back of Officer Fanone's neck. As the electric spark of the weapon rang out, Officer Fanone screamed again.

The Reyhers were nearby this violence. Arthur Reyher moved towards Officer Fanone and heard rioters exclaim that they should use Officer Fanone's gun against him. As explained by Arthur Reyher, he put his arm up to shield against another rioter attempting to attack Officer Fanone. Arthur Reyher and several other rioters facilitated Officer Fanone's return to the tunnel.



*Image 32: Screenshot of open-source footage showing rioters assaulting Officer Fanone as Arthur Reyher (red square) approached him*

As Officer Fanone made it back into the tunnel, he collapsed – unconscious – on the floor of the tunnel at the feet of MPD Sergeant Jason Mastony.

But even after watching Officer Fanone get dragged into the crowd and brutally assaulted, Arthur Reyher then, *again*, rejoined the rioters at the mouth of the tunnel at about 3:21:45 p.m. For the next ten minutes, Arthur Reyher continued to encourage rioters as he remained close by the tunnel. He yelled towards the crowd, waved rioters towards the tunnel, and passed a bullhorn to a rioter at the front of the police line.



*Images 33-34: Screenshot of Capitol surveillance footage showing Reyher watching violence against officers as he yelled toward the tunnel (left photo) and then turned to wave rioters towards the tunnel (right photo)*

In total, the Reyhers were in and around the tunnel and participating in the collective assault on the police officers, encouraging other rioters, and watching violence against officers for more than an hour.

### 3.    Victim Information

There were numerous police officers who suffered physical and psychological injury from the actions of rioters who were acting in concert with the Reyhers in the tunnel. The government is providing, as an exhibit for sentencing, a video statement from MPD Commander Ramey Kyle, who was the highest-ranking officer in the LWT tunnel between approximately 2:30 p.m. and 5:00 p.m., to supplement the record regarding the impact that the Reyhers' crimes had on the officers. *See* Exhibit 1 (which is being provided on a flash drive to the Court).[4] In the statement,

---

[4] The statement includes footage taken from the following other videos of the battle inside the LWT tunnel on January 6, 2021: (1) body worn camera footage ("BWC") of MPD Sgt. William Bogner; (2) BWC of MPD Officer Bronson Spooner; (3) closed circuit television from the U.S. Capitol; (4) video obtained from defendant Louis Cantwell 21-cr-89 (EGS); (5) the "*UNBELIEVABLE Footage: Trump Supporters Battle Cops Inside the Capitol*" video, which is

Commander Kyle describes the violence that he observed from rioters in the tunnel that was directed against him and his fellow officers, and the impact this had on them. This information describes the physical and emotional impact that the rioters had on the officers who were assaulted in the tunnel at the time of the Reyhers' actions.

### 4.     The Reyhers' Debriefings With The FBI

Pursuant to the terms of their plea agreements, both Arthur Reyher and Jessica Reyher were separately debriefed by the FBI in the presence of their attorneys.

In his debriefing, Arthur Reyher stated that he traveled to Washington, D.C. to protest what he believed to be a "fraudulent election." Arthur Reyher was aware that Congress was meeting on January 6 to certify the results of the recent presidential election. His purpose in attending the rally and marching to the Capitol was to try to get Congress to "investigate issues." Arthur Reyher saw bike racks littered on the ground as he approached the Capitol. Arthur Reyher said he recognized the tunnel as an entry point into the Capitol and wanted to get inside the Capitol building. He admitted to chanting "USA!" and "This is our house!" Arthur Reyher recalls an officer getting caught in the doorframe, but did not remember how the circumstances unfolded. He recalls seeing much violence on January 6, including rioters using a bike rack against officers on the West Front, rioters spraying officers with chemical irritant, rioters using shields and flagpoles as weapons against officers, and rioters dragging Officer Michael Fanone out of the tunnel and talking about shooting Officer Fanone using his own gun. Despite all of this, Arthur Reyher entered the tunnel and joined heave-ho thrusts numerous times so that he could – in his words – gain entry into the

---

part of Exhibit 1; (6) BWC of MPD Sgt. Jason Mastony; (7) BWC of Sgt. Joseph Austin; and (8) BWC of Sgt. Bernard Grimsley.

Capitol building. Arthur Reyher also described several instances where he believed that he was helping police officers. He said, for example, that he put himself between rioters and the officers when the rioters were using a bike rack against the officers; that he pushed a flagpole into the air so that another rioter couldn't hit officers with it; and that he assisted Officer Fanone back into the tunnel.[5] Arthur Reyher reported that, after dragging Officer Fanone into the crowd, he heard rioters discuss shooting Officer Fanone with his own firearm. Arthur Reyher stated that he asked Officer Fanone where he wanted to go, and Officer Fanone responded that he wanted to return home to his children. When asked why he didn't leave despite witnessing repeated instances of violence against police officers, Arthur Reyher did not offer an explanation. And when asked whether he re-approached the tunnel after witnessing the attack on Officer Fanone (he did, as explained above), Arthur Reyher stated that he could not remember. Arthur Reyher explained that he ultimately left the Capitol grounds because he realized that violence had gotten to a point where he could not stop it. Arthur Reyher repeatedly characterized himself as "helping" police officers, explaining that the reason he entered the tunnel was to "lead by example"—despite encouraging rioters to "PUSH" through the officers and repeatedly joining collective assaultive efforts against officers. Arthur Reyher expressed that he regretted entering the tunnel and pushing because of the outcomes that it had led to.

Jessica Reyher stated that she traveled to Washington, D.C. to attend the "Stop the Steal" rally because she felt like the election was not fair. Jessica Reyher was aware that Congress was meeting on January 6 to certify the results of the recent presidential election. Her purpose in attending the rally and marching to the Capitol and participating in what devolved into a riot was

---

[5] To our knowledge, only the Officer Fanone instance is captured on video footage.

because Congress should provide an explanation – the American people deserved an explanation. Jessica Reyher said that she entered the tunnel because that's what the crowd was doing. She acknowledged that she saw police officers in the tunnel and knew that the officers were trying to keep rioters out of the building. When in the tunnel and joining the heave-ho pushing, Jesscia Reyher remembers someone saying that a person was "trapped" or "pinned." She claims that she did not want anyone to get hurt. But she witnessed rioters using flag poles to hit police officers and using shields as weapons against officers and did not immediately leave the tunnel. She saw rioters attempting to break through a window to enter the Capitol building. Jessica Reyher explained that she entered the tunnel numerous times – despite witnessing the violence – because emotions were high and she wanted her voice to be heard. Jessica Reyher explained that the purpose of pushing into the police officers was to gain entry into the Capitol building to get where the certification process was happening so that Congress could hear the voices of the crowd. Jessica Reyher recalls seeing Officer Fanone get dragged into the crowd and heard a rioter say, "let's hold him hostage" and let's use his gun against him. Jessica Reyher watched as Arthur Reyher assisted Officer Fanone. Jessica Reyher expressed remorse for her conduct and acknowledged that she was part of the violence against police officers.

### III.    THE CHARGES AND PLEA AGREEMENT

Arthur Reyher and Jessica Reyher were arrested on March 8, 2023 after a criminal complaint was filed charging them with six criminal violations related to the Capitol riot. ECF Nos. 13, 18; Minute Order (3/15/2023). On April 26, 2023, a federal grand jury returned an indictment charging Arthur Reyher and Jessica Reyher with six counts, including Civil Disorder in violation of 18 U.S.C. § 231(a)(3). On November 6, 2023, Arthur Reyher and Jessica Reyher

were both convicted of that offense based on guilty pleas entered pursuant to plea agreements.

## IV.    STATUTORY PENALTIES

Arthur Reyher and Jessica Reyher now face sentencing on 18 U.S.C. § 231(a)(3). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendants face up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

Consistent with the plea agreements, ECF No. 85 at 3 (Arthur Reyher) and ECF No. 87 at 3 (Jessica Reyher), the Probation Office calculated the combined offense level of the count of conviction as 11, as set forth below.

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Offense Involving Physical Contact | +3[6] |
| **Total Offense Level:** | | **13** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | | <u>-2</u> |
| **Adjusted Offense Level:** | | **11** |

---

[6] In her sentencing memorandum, Jessica Reyher now argues that the application of the +3 overstates her conduct and the Court should vary downward as a result. This argument is in direct contrast to Jessica Reyher's acceptance of responsibility. By accepting the plea agreement, Jessica Reyher has agreed to the appropriateness of the application of this guideline based upon her agreed-upon conduct, and the Court should not tolerate a last-minute effort to renege on her plea agreement and obtain a benefit of a lower guidelines range.

*See* PSR ¶¶ 45-53 (Arthur Reyher); PSR ¶¶ 44-52 (Jessica Reyher); Plea Agreements at ¶ 6(A).

The U.S. Probation Office calculated both Arthur Reyher's and Jessica Reyher's criminal histories as category I, PSRs ¶ 56, which the government does not dispute. Accordingly, based on the government's calculation of the Reyhers' total adjusted offense level of 11 after acceptance of responsibility, the Reyhers' Guidelines imprisonment range is 8 to 14 months. PSR ¶ 80 (Arthur Reyher); PSR ¶ 79 (Jessica Reyher).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 was not considered at the time the parties entered into the plea agreement. It does not impact either defendant's guideline calculations.

Section 4C1.1 does not apply in this case because the Reyhers used violence against officers, including when they used their bodies to forcefully push against the line of officers protecting the Capitol building in the tunnel. *See* U.S.S.G. § 4C1.1(a)(3) (providing that the adjustment for zero-point offenders only applies if "the defendant did not use violence or credible threats of violence in connection with the offense"). As explained in this memorandum, the Reyhers joined the mob and collectively thrust their bodies into the police line on numerous occasions in attempt to force their way through police officers and into the building. At one point, the Reyhers made it to nearly to the front of the police line inside the tunnel – less than a foot away from police officers – as they forcefully pushed into the officers. Using one's body to forcefully thrust into a police line with a collective mass is plainly violent conduct.

Additionally, while in the tunnel, the Reyhers joined chants and yelled that they planned to take over the Capitol building notwithstanding the opposition of the police officers, which, under the circumstances, was at the least a credible threat of violence. Arthur Reyher continued yelling as he forcefully pushed into police officers at the front of the mob. *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5 (holding that "violence" is defined as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm" and "the "exertion of any physical force so as to injure or abuse."); *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (same).

Arthur Reyher also made credible threats of violence, as he joined the collective pushing and directed and encouraged rioters to "PUSH!" as they entered the tunnel. As explained in this memorandum, the rioters did, in fact, push and cause bodily injury to officers as a result. *See* 4C1.1(a)(3) (The Section 4C1.1 adjustment is applicable if the defendant meets the following criteria: "the defendant did not use . . . credible threats of violence in connection with the offense").

The government is aware of several cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, including in cases where the disqualifying conduct included pushing into police officers in the tunnel, like here: *United States v. Giberson*, 23-cr-115 (CJN) (declining to apply the 4C1.1 adjustment, because the defendant's heave-ho pushes against officers in the tunnel constituted violent conduct, in a case involving a plea to 18 U.S.C. § 231(a)(3)); *United States v. Kepley*, 23-cr-162 (BAH) (declining to apply the 4C1.1 adjustment, because defendant's heave-ho pushes against officers in the tunnel constituted a "credible threat of violence" against those officers, in a case involving a misdemeanor plea to 18 U.S.C. § 1752(a)(1)); *see also, e.g.*, *United States v. Grace*, 21-cr-138 (RBW); *United States v.*

*Bauer*, No. 21-cr-386-2 (TNM); *United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); *United States v. Fonticoba*, 21-cr-638 (TJK); *United States v. Dillard*, 23-cr-49 (JMC).

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, the Reyhers' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The Reyhers were protracted and active participants in that riot. They made their way to the epicenter of violence – the tunnel – which they entered several times, making their way near the front of the crowd each time and actively pushing into the police line with their own bodies and by taking advantage of the collective weight of those around them. The collective nature of the rioters' attack – which both Arthur Reyher and Jessica Reyher repeatedly joined – created the perilous position of the officers, making it nearly impossible for the officers to defend the Capitol building without getting brutally attacked as they were continuously and gravely outnumbered. And for their part, the Reyhers joined numerous times, ensuring that the rioters remained "fresh" in the tunnel and maintained momentum in the assault against the officers.

The Reyhers have acknowledged that the reason they joined these collective assaults was to gain entry to the building and get to Congress. Both defendants repeatedly *chose* to use violent means to gain unlawful access to the United States Capitol Building. Moreover, both defendants

28

joined the rioters in yelling and riling up the crowd and Arthur Reyher repeatedly encouraged rioters to "PUSH!" Each time the Reyhers physically thrust themselves into the wall of rioters pushing against the police, they aided and abetted the actions of their fellow rioters inside the tunnel who violently attacked the officers. For Arthur Reyher, even after he assisted Officer Fanone, he returned to the tunnel and, again, summoned rioters to the tunnel – waving them towards the tunnel – and joined chants as rioters continued to violently attack police officers.

**B.      Arthur Reyher's and Jessica Reyher's History and Characteristics**

Arthur Reyher is a 39-year-old real estate broker and general contractor from Indiana. He has steady employment and a family. Arthur Reyher has a minor criminal history, including possession of marijuana and possession of paraphernalia, criminal trespass, improper boat equipment, improper passing, and speeding. PSR ¶¶ 54, 58, 60.

Jessica Reyher is a 39-year-old businessperson from Indiana. She assists her husband and co-defendant in running construction and real estate companies and owns four companies, including rental, storage, ranch, and trucking businesses. PSR ¶ 74. Jessica Reyher and Arthur Reyher have four children. Jessica Reyher has no criminal history.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. The Reyhers' criminal conduct on January 6 was the epitome of disrespect for the law and our constitutional process. When the Reyhers entered the Lower West Tunnel on numerous instances, they made active decisions to physically engage with police in what some of those officers have characterized as a "medieval battle." *See*, *e.g.*, Peter Herman, *'We got to hold this door'*, WASHINGTON POST, January 14, 2021, *available at*

29

https://www.washingtonpost.com/dc-md-va/2021/01/14/dc-police-capitolriot/?arc404=true.

The Reyhers, as members of that mob, were not merely disrespecting the law, they were active participants in an attack on the bedrock principle of our republic. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that this violent conduct and the motives that underlie it are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (explaining it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence against the Reyhers also weighs in favor of a lengthy term of incarceration. The Reyhers were involved with violence toward police officers in the tunnel on several occasions. Each time the Reyhers entered the tunnel, they ignored repeated police commands to "GET BACK!" and ignored chemical irritants that successfully moved other rioters back. In several instances, the Reyhers chose to enter the tunnel amidst violence.

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Both defendants stated that they wished they had never participated in the riot because of the consequences of doing so. While perhaps true today, it is not lost that, on January 6, the Reyhers *repeatedly* put themselves in positions to create a more violent attack against police officers. They continued to enter then tunnel, adding to the chaos and making it all the more difficult for officers to clear the area; they continued to use their bodies to collectively push against the officers, in attempt to physically force their way into the Capitol to reach Congress; and they repeatedly joined the chanting, elevating the chaos. Arthur Reyher and Jessica Reyher exercised bad judgment – again and again on January 6, and they did so at the cost of the safety of police officers. And incredibly, both defendants have now characterized their conduct as being helpful to police officers. The Reyhers' repeated use of physical force and aiding and abetting near-deadly violence was anything but helpful to the police officers. That the Reyhers have maintained this was their intent and action inside the tunnel is a factor that should be weighed heavily when considering specific deterrence. Thus, the government's recommended sentence is sufficient but not unnecessary to specifically deter the Reyhers should they become dissatisfied with the outcomes of future elections.

Additionally, in his case, even after January 6, Arthur Reyher has posted on social media regarding his continued belief that Donald Trump won the 2020 Presidential Election and his belief that the election results were fraudulent. Arthur Reyher has also "reposted" a Tweet referencing the "horrific acts by those police officers in . . . DC" in reference to January 6, and has continued to support the narrative that rioters were victims on January 6.

E.      **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Roger Kent Baugh*, 22-cr-313 (JEB), Chief Judge Boasberg sentenced defendant Baugh to 12 months and one day of incarceration and 24 months of supervised release for a single violation of 18 U.S.C. § 231. Like the Reyhers, Baugh did not enter the Capitol building except in the tunnel, but Baugh twice joined the collective assault against officers in the tunnel. Baugh first watched the violence against the police line from near the mouth of the tunnel. When rioters called for more people, Baugh entered the tunnel and joined in the collective effort to break through the police line by "heave-ho" pushing. As Baugh pushed into the police line, other rioters

---

overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

attacked the officers using a variety of weapons. After retreating from the tunnel, Baugh continued to watch the violence against the officers. Baugh then re-entered the tunnel for a second time and again joined the collective assault against the officers before he was pushed out.

The conduct of defendant Baugh and the Reyhers were similar once in the tunnel. However, the Reyhers entered the tunnel three times and reapproached several times after, whereas Baugh entered twice; the Reyhers made it to the front of the attack, whereas Baugh made it to the middle; and the Reyhers joined the collective assault for far longer than Baugh. Also unlike Baugh, Arthur Reyher encouraged other rioters to "PUSH!" and both of the Reyhers repeatedly joined the rioters' chants during the collective assault.

In *United States v. Preller*, 23-cr-45-1 (TNM), Judge McFadden sentenced defendant Preller to 8 months of incarceration following a plea to a violation of 18 U.S.C. § 231(a)(3). On January 6, Preller came to the Capitol wearing a helmet and tactical vest. He made his way through the West Front and approached the tunnel at about 4:00 p.m. Before entering the tunnel, he watched as other rioters attacked the police line. Preller entered the tunnel, put his head down, and joined the mob in the "heave-ho" movements, putting the intense aggregate pressure on the police line. Preller exited from the tunnel only after officers successfully pushed the rioters out of the tunnel.

Like Preller, the Reyhers – particularly Arthur Reyher – watched violence against officers before entering the tunnel. Also like Preller, the Reyhers entered the tunnel and used the force of their bodies to join the mob's assault against the police line. However, whereas Preller entered the tunnel once, the Reyhers entered three times (and approached the archway several other times), made it to the front of the pack of rioters, and engaged in assaultive conduct far longer than Preller. Also, Arthur Reyher encouraged other rioters' assaults against the officer line.

35

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that the Reyhers must each pay $2,000 in restitution, which reflects in part the role Reyher's played in the riot on January 6.[11] Plea Agreements at ¶ 12. As the plea agreements reflect, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property . . . including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

governmental agencies as of July 2023. *Id.* The Reyhers' restitution payments must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 109 (Arthur); PSR ¶ 101 (Jessica).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Arthur Reyher to 12 months of incarceration, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment, and Jessica Reyher to 9 months of incarceration, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: /s/ Ashley Akers
ASHLEY AKERS
MO Bar No. 69601
Trial Attorney, Detailee
601 D Street NW
Washington, DC 20001
(202) 353-0521
Ashley.Akers@usdoj.gov